## IN THE UNITES STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SAMEH FAWZY )<br><br>Plaintiff, )<br><br>v. )<br><br>ILENE MORRIS-SAMBUR and CREATING )<br>OPPORTUNITIES BY RECOGNIZING )<br>ABILITIES, LLC )<br><br>Defendants. ) | Case No. _____<br><br><br>**COMPLAINT** |

Plaintiff, by and through his undersigned attorneys, allege against Defendants on information and belief as follows:

### THE PARTIES

1.      Plaintiff Sameh Fawzy is an individual currently residing in the District of Columbia at 6900 Georgia Avenue, Washington DC 20307.

2.      On information and belief, Defendant Ilene Morris-Sambur is an individual residing at 541 Bershire Valley Road, Wharton, New Jersey 07885.

3.      On information and belief, Defendant Creating Opportunities by Recognizing Abilities, LLC ("CORA") is a corporation organized and existing under the laws of the State of New Jersey with its principle office located at 541 Bershire Valley Road, in the City of Wharton, State of New Jersey 07885.

4.      Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the Defendants sued herein was the agent and employee of the other Defendant and was at all times acting within the purpose and scope of such agency and employment.

## JURISDICTION AND VENUE

5.      This action is brought to recover damages for a course of conduct where the overwhelming amount of the parties conduct occurred within the District of Columbia.  In particular, the Defendants solicited contact with Plaintiff in the District of Columbia; the parties had frequent contact either in person, by telephone or email where at least one the parties was located within the District of Columbia; the contract at issue was signed by Plaintiff while he was residing within the District of Columbia; and lastly, Plaintiff is, and all relevant times was, a resident in the District of Columbia.

## NATURE OF ACTION

6.      Plaintiff is a 31 year-old veteran, who is undergoing medical and psychological treatment at Walter Reed Army Medical Center ("Walter Reed") for injuries sustained while serving combat duty in Iraq.  After approximately 18 months of psychological and other medical treatment at Walter Reed, Plaintiff was ready to begin the transition back to civilian life and participated in a job fair sponsored by Walter Reed. It was at this job fair, where Plaintiff first encountered Sambur who was also participating in the job fair, representing her company CORA.

7.      During the December 2006 job fair, Sambur initiated her scheme to deceive Plaintiff by gaining his trust and ultimately talking him into turning over to her a total of $70,000 – basically all the money Plaintiff had in his possession and the maximum amount of cash he was able to advance from his credit cards.

8.      Sambur's conduct was particularly malicious because at all times during her dealings with Plaintiff, she had full knowledge of Plaintiff's psychological and physical condition, and nonetheless took complete advantage of a recuperating solider trying to reintegrate back into society after returning from combat duty in Iraq.

2

**Defendants Knew Plaintiff Was Undergoing Psychological and
Medical Treatment at the Time They Appropriated Plaintiff's Money.**

9.     Walter Reed periodically sponsors job fairs to help injured soldiers who
are ready to leave the hospital to find employment suitable to their individual injuries
and/or stages of recuperation.  Employers who are willing and able to offer the kind of
employment opportunities that are suitable for these soldiers, are invited to attend Walter
Reed's job fairs.

10.     The employers who participate in Walter Reed's job fairs are fully aware
that the individuals with whom they will be interviewing are undergoing treatment at
Walter Reed because of physical or psychological injuries and are expected to interact
with these individuals in a fair and conscientious manner.

11.     During Walter Reed's December 2006 job fair, Sambur spoke to Plaintiff
about potential employment opportunities with her company CORA.  Plaintiff explained
to Sambur that he was looking for employment where he could work primarily from
home because being out in the public caused him severe stress.  Plaintiff was suffering
from psychological trauma that made it very difficult for him to interact with people.
Sambur told Plaintiff that CORA was a good fit for him because he could perform
telemarketing from his hospital room until he was ready to move out and could continue
to work for CORA once he was home.

12.     At the conclusion of their conversation, Sambur asked Plaintiff to leave
his contact information so that they could talk further about his employment with CORA.

13.     Over the next few weeks, Plaintiff and Sambur communicated several
times on the telephone and through email correspondence.  During these conversations,
Sambur engaged in a scheme to gain Plaintiff's trust. Though the parties had known each
other for a couple of weeks, Sambur told Plaintiff that he was "part of her family" and

that she "only wanted to do what was best for him" and often concluded her email correspondence with "hugs Ilene."

14.    During the course of these conversations, Sambur made several misrepresentations to Plaintiff regarding the financial success of CORA. Sambur falsely told Plaintiff that CORA had recently been awarded a number contracts to perform telemarketing that now needed to be staffed. Specifically, Sambur stated that CORA had just been awarded a contract from the government worth $2 million in revenue to CORA. Sambur also falsely contended that CORA had continuing contracts for vocational rehabilitative training with more than fifteen different states.

15.    Sambur contended that these contracts were going to make CORA a lot of money and urged Plaintiff to take advantage of these alleged profits by investing in CORA. Sambur made these representations knowing that they were false and with the purpose of deceiving Plaintiff into "investing" in CORA.

16.    Sambur told Plaintiff that if he bought a partnership interest in CORA he would be able to draw a salary by doing telemarketing from home. In addition, Sambur represented that as a part-owner; he would share in CORA's purportedly vast profits. Sambur promised Plaintiff that given CORA's backlog of contracts he could work from home and make as "much money as he chose to make."

17.    By January 2006, Sambur had convinced Plaintiff to invest in CORA. Plaintiff agreed to invest in CORA because he had grown to trust Sambur and viewed this opportunity as a much needed "life-line" where he could earn a salary while working from home and share in the CORA's profits that would help him to regain his financial security.

18.    By facsimile dated January 30, 2007, Sambur forwarded Plaintiff an Operating Agreement ("Agreement") that created CORA, LLC. (Attachment 1, hereto).

4

The Agreement required Plaintiff to pay $100,000 in exchange for a 33% ownership interest in CORA. Sambur, though she was not making any capital contribution, was given a 67% interest in CORA and essentially sole control of CORA.

19.     The Agreement was drafted by Sambur's counsel. The terms of the Agreement were entirely one-sided giving Sambur all the decision-making power and control over the finances. For example, the Agreement provided that Sambur would make all the decisions (Agreement ¶ 3.4) and could unilaterally require additional capital calls that requiring Plaintiff to invest additional funds. (Agreement ¶ 5.4).

20.     On information and belief, Sambur has made public representations that CORA is a non-profit company, however the Agreement that purportedly created CORA, defines the company as Limited Liability Company, that for tax purposes is to be recognized as a partnership and that all profits are to be divided based on share of ownership. (Agreement ¶ 1.0).

21.     In February, without advice from counsel, Plaintiff signed the Agreement and wired to Sambur $70,000. Plaintiff obtained $27,000 in cash by closing out all of his savings accounts and a Certificate of Deposit. In addition, at Sambur's urging, Plaintiff took out cash advances on all of his available credit cards totaling approximately $43,000. On average the credit card companies are charging Plaintiff an average annual interest rate of approximately 15% on the outstanding balances.

22.     Over the next two months, Sambur repeatedly pressured Plaintiff to contact friends and family members to try to obtain the remaining $30,000. Plaintiff was not able to do so and ultimately paid $70,000 out of the $100,000 specified in the Agreement.

23.     Despite making several requests to Sambur, Plaintiff never received a signed copy of the Agreement back from Sambur. In addition, though Sambur had

DM_US:20899533_7

promised Plaintiff that she would provide him with stock certificates - Plaintiff never
received the stock certificates.

24.     During March and April 2007, Plaintiff did some work for CORA from
his hospital room at Walter Reed consisting mainly of data entry and some telemarketing.
However, now that Sambur had possession of the $70,000, she started shutting Plaintiff
out of the business operations of CORA by, *inter alia*, refusing to take his calls, ignoring
his emails, and even refused to accept certified letters from Plaintiff.

25.     During March and April 2007, Plaintiff learned that Sambur had
misrepresented the contracts she claimed had been awarded to CORA. In fact, because
there were no contracts that needed staffing, there was little work for Plaintiff. Instead,
Sambur now claimed that she was unable to interact with Plaintiff or answer his
questions, because she was constantly in meetings attempting to get the contracts – the
same contracts she had previously stated had already been awarded to CORA.

26.     During this time, Plaintiff started experiencing increased psychological
and physical problems that were impeding his recovery. On or about May 29, 2007,
Plaintiff informed Sambur that he wanted to terminate his relationship with CORA and
requested his $70,000 be returned. Sambur refused claiming that she had spent all of the
money.

27.     Plaintiff pleaded with Sambur explaining that he was soon going to be
released from Walter Reed and needed money for a place to live. Sambur steadfastly
refused Plaintiff's requests to return the $70,000.

28.     Presently, Plaintiff is residing at Walter Reed Hospital, has no savings, no
employment and not enough money to secure living arrangements.

29.     Had Plaintiff had been had been aware of the true facts, he would have not
agreed to invest in CORA. As a direct and proximate result of Plaintiff's dealing with

6

Defendants, he has suffered and continues to suffer from loss of money, loss of employment, stress, anxiety, loss of sleep, and other mental, emotional and financial distress.

## FIRST CAUSE OF ACTION
### Fraudulent Misrepresentation

30.    The allegations contained in paragraphs 1 -29 are incorporated herein by reference.

31.    Plaintiff is informed and believes, and thereon alleges, that at all times mentioned Sambur was the agent of CORA and was at all times acting within the purpose and scope of such agency.

32.    From December 2006 continuing through February 2007, Defendants knowingly made a series of misrepresentations regarding the financial success, contracts that had been awarded, and overall profitability of CORA.

33.    Specifically, in January 2007, Defendants alleged that CORA had been awarded a $2 million contract by the government that needed to be staffed by CORA. Defendants further alleged that this contract would substantially increase CORA's profitability.

34.    In January 2007, Defendants also knowingly misrepresented that CORA had been awarded vocational rehabilitative training contracts in some fifteen states that also needed to be staffed by CORA.  Defendants further alleged that these contracts would increase CORA's profitability.

35.    At the time Defendants made these misrepresentations, Defendants knew they were false, and made these representations with the principle  intent and purpose of deceiving Plaintiff into turning over money to Defendants.

7

36.     Defendants were aware of Plaintiff's medical issues and intentionally and maliciously used it that knowledge to persuade Plaintiff to act in a manner that they knew would harm him.

37.     At the time these misrepresentations were made, Plaintiff did not know, and no reason to know that Defendants' statements regarding CORA were false.  Had Plaintiff known the true facts regarding CORA's financial situation, he would not have agreed to turn over $70,000 to Defendants.

WHEREFORE, Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing

38.     The allegations contained in paragraphs 1- 37 are incorporated by reference.

39.     Plaintiff and Defendants entered into a contract that is referred to above as the Agreement (Attachment 1).  By the above actions, Defendants have willfully  and knowingly breached their implied covenant of good faith and fair dealing owed to Plaintiff .

40.     Plaintiff has been and continues to be irreparably harmed as a result of Defendants' breach of the implied covenant of good faith and fair dealing.  Plaintiff has been damaged in an amount which cannot be fully determined at this time, but which, in any event, exceeds $70,000.

DM_US:20899533_7

41.    As a result of Defendants' breach, Plaintiff was deprived the benefits that he reasonably expected by entering into the Agreement with Defendants.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

### THIRD CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

42.    The allegations contained in paragraphs 1 – 41 are incorporated by reference.

43.    Defendants were fully aware that Plaintiff was receiving psychological and other medical treatment as a result of serving combat duty in Iraq and was in fact still residing at Walter Reed hospital at the time they induced Plaintiff to invest in CORA.

44.    By participating in Walter Reed's job fair and holding CORA out as a company that is willing, and able to help soldiers recuperating from injuries and in need of special employment opportunities, and also as a potential employer and business associate owed Plaintiff a duty of care.

45.    Defendants nevertheless engaged in their scheme and  knowingly took advantage of Plaintiff's impaired mental and emotional state, and acted in a manner they knew would result extreme emotional distress to Plaintiff.

46.    Defendants knew that because of Plaintiff's medical condition that the failure to exercise due care in the performance of business dealings with Plaintiff, would cause Plaintiff emotional distress.

47.    Defendants' actions proximately caused Plaintiff to suffer severe emotional distress and aggravated his existing medical and psychological condition.

9

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## FOURTH CAUSE OF ACTION
### Securities Fraud Under Section 10(b)(5) of the Securities Exchange Act

48.    The allegations contained in paragraphs 1 - 47 are incorporated by reference.

49.    Defendants' intentionally engaged in a practice to defraud Plaintiff in connection with the purchase of shares in CORA and thereby violated the terms of Section 10(b)(5) of the Security Exchange Act of 1934.

50.    Defendants intentionally made false statements regarding the profitability of CORA and their scheme to appropriate Plaintiff's money was clearly tied to the purchase of shares of stock in CORA.

51.    Defendants' receipt of the monies paid by Plaintiff was directly in connection with the purchase of shares in CORA.

10

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## PRAYER FOR RELIEF

Plaintiff, prays for judgment against Defendants, jointly and severally, for the damages alleged herein and in such amount as the evidence may show at the time of trial, together with costs, fees, prejudgment interest at the rate allowed by law, and for such other further relief, special and general, at law and in equity, to which Plaintiff shows himself justly entitled.

DATED: January _15_, 2008

Donna M. Drake
*Pro Bono Representation***
HOWREY LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 783-0800 – Office
(202) 383-6610 - Facsimile

*** I am filing this complaint in accordance with LCvR 83.2(g) and hereby certify that I am representing Plaintiff on a pro bono basis and am not receiving any compensation.*

11

A

# LYON, GLASSMAN, LEITES & MODI, L.L.C.
### ATTORNEYS AT LAW

256 COLUMBIA TURNPIKE
SUITE 103, SOUTH TOWER
FLORHAM PARK, NEW JERSEY 07932

REXFORD L. LYON
ELIANA M. LEITES*
DEVANSHU L. MODI*
ANTHONY G. WAHL

*Admitted NJ and NY

(973) 822-1822
Fax (973) 822-9212
www.lglmlaw.com

OF COUNSEL
MAX GLASSMAN

January 30, 2007

<u>Via Facsimile (877-772-3727)</u>
Ilene Morris-Sambur
CORA,. L.L.C.
541 Berkshire Valley Road
Wharton, New Jersey 07885

Re:    Operating Agreement

Dear Ilene:

Enclosed please find a revised Operating Agreement.

As always, please contact me with any questions.

Thank you.

Very truly yours,

LYON, GLASSMAN, LEITES & MODI, L.L.C.

Devanshu L. Modi

DLM/jce

# Operating Agreement
# Creating Opportunities by Recognizing Abilities, L.L.C.

THIS OPERATING AGREEMENT is made as of this ____ day of _____, 2007, by and between Ilene Morris-Sambur residing at 541 Berkshire Valley Road, Wharton, New Jersey 07885(hereinafter referred to as "Ilene") and Sameh Fawzy residing at 6900 Georgia Avenue, NW Malone House, Washington D.C., 20307 (hereinafter referred to as "Sameh") (both hereinafter referred to as the "Members").

WHEREAS, Ilene Morris-Sambur and Sameh Fawzy are the sole Members of Creating Opportunities by Recognizing Abilities, L.L.C., a limited liability company organized under the laws of the State of New Jersey.

WHEREAS, the Members have agreed that Ilene Morris-Sambur will serve as the Manager of the limited liability company as more particularly set forth in this Operating Agreement.

WHEREAS, the parties wish to establish the relationship between the Members and the relationship between the Company and the Manager, all as more particularly set forth in this Operating Agreement.

NOW THEREFORE, the parties agree as follows.

## 1.0 FORMATION

1.1     Name.  The name of the limited liability company is  Creating Opportunities by Recognizing Abilities, L.L.C. (hereinafter referred to as the "Company").

1.2     Business.  The Company is formed to engage in the business of providing telework training, placement and supervision (hereinafter referred to as the "Business").

1.3     Certificate of Formation.  Attached hereto and made a part hereof is the Certificate of Formation of the Company filed in the Commercial Recording Bureau of the Office of the State Treasurer of the State of New Jersey.

1.4     Term.  The term of this Company shall commence on the date of the filing of the Certificate of Formation and shall continue in existence until terminated pursuant to the provisions of this Operating Agreement.  Unless terminated pursuant to the provisions of this Operating Agreement, the existence of the Company shall be perpetual.

1.5     Registered Agent and Office.  The Company's registered Agent shall be Ilene, and its registered office shall be 541 Berkshire Valley Road, Wharton, New Jersey 07885, New Jersey or such other person or place as may be designated from time to time by the Manager.

1.6     Place of Business.  The principal office of the Company shall be 541 Berkshire Valley Road, Wharton, New Jersey 07885, New Jersey, or at such other place as may be designated from time to time by the Manager.

## 2.0 MEMBERS

2.1     Annual Meeting.  The annual meeting of the Members of the Company for the purposes of considering proposals laid before such meeting, electing a Manager for the ensuing year, and transacting such other business as may properly be brought before such meeting shall be held at the principal office of the Company or at such other convenient place, either within or without the State of New Jersey, as may be designated by the Manager and specified in the notice of such meeting.  The annual meeting will be held on the last business day of December of every year.

2.2     Special Meetings. Special meetings of the Members of the Company may be held when called by the Manager or by any of the Members. Upon request in writing delivered either in person or by certified mail, return receipt requested by any Member to the Manager, the Manager shall forthwith cause notice to be given to all members entitled to notice of the upcoming meeting.  The meeting shall be held on a date not less

than three (3) nor more than twenty (20) days after the receipt of such request as the Manager may fix. If notice is not given by the Manager within three (3) days after the delivery or mailing of the request, the person or persons requesting the meeting may fix the time of the meeting and give notice thereof in the manner provided by law or by this Operating Agreement. Each special meeting shall be called to convene between 8:00 a.m. and 6:00 p.m. and shall be held at the principal office of the Company.

2.3     Notice of Meetings. Not less than three (3) nor more than sixty (60) days before the date fixed before a meeting of Members, written notice stating the time and place of the meeting, and, in the case of a special meeting, the purpose of such meeting, shall be given to each Member entitled to vote thereat.

2.4     Voting.

a.     Each Member shall have one vote for each LLC Percentage Interest point owned by that Member. All decisions of the Members shall be made by way of majority of LLC Percentage Interests, except where this Operating Agreement requires unanimous decision by the Members. "LLC Percentage Interest" is defined in Section 5.1 and 5.2 below.

b.     The following decisions shall require the unanimous vote of all the Members:

(i)     amendment of this Operating Agreement;
(ii)    sale of the Business to a third party;
(iii)   dissolution of the Company.

2.5     Quorum and Adjournments. Except as otherwise provided by law or by this Operating Agreement, the holder of a majority of the voting power of the Company shall constitute the quorum necessary for the meeting to occur and to conduct business. If, during the course of a meeting, the meeting is adjourned to a new date, notice of the new meeting date and place shall be given in the manner as provided in section 2.3 above.

2.6     Unanimous Consent. Any matter that may be decided in an annual meeting of Members or at a special meeting of Members may be decided by a unanimous written consent of the Members without having a meeting. Any such unanimous consent shall be in writing, and signed and dated by all of the Members. It shall be kept in the regular minutes of the meetings of Members of the Company.

2.7     Telephone Meetings. Any meeting may be conducted over the telephone provided that all of the Members present can hear all of the other Members and can be heard by them.

3.0     MANAGER

3.1     Initial Manager. The initial Manager shall be Ilene Morris-Sambur.

3.2     Election of Manager. The Manager shall be elected at each annual meeting of the Members or at a special meeting called for the purpose of electing a successor Manager in the event the Manager resigns.

3.3     Term of Office. The Manager shall hold office until his successor is elected at the next annual meeting of Members or at such time as he may resign, be removed from office, or die. Upon the resignation, removal or death of the Manager, the Members shall convene a special meeting for the purpose of electing a successor manager.

3.4     Authority of Manager.

a.     The Manager shall be responsible for management of the Company's day to day business operations with all rights and powers generally conferred by law or necessary, advisable or consistent therewith, but subject to the limitations set forth in this Operating Agreement.

b.     Any person entering into any agreement or contract with the Company or otherwise dealing with the Company shall not be required to inquire as to the authority of the Manager to act for and on behalf of the Company, and such persons may conclusively rely upon the act or acts of the Manager as being the act or acts of the Company and binding upon and enforceable against the Company.

c.     The power and authority of the Manager shall be subject in all cases to (i) the provisions of this Operating Agreement, (ii) the decisions of the Members at the annual or a special meeting of Members, and (iii) the requirements of applicable law.

2

d.    The Manager shall not undertake any of the following actions without the approval of the Members taken at a special meeting or annual meeting of the Members: (i) amend this Operating Agreement, (ii) deviate from the purposes of the Company as set forth in Section 1.2 above, (iii) cause the Company to borrow money in excess of $30,000.00 from any person or entity, (iv) engage in business in any jurisdiction which does not provide for the registration of limited liability companies, (v) pay fees to a Member or to himself, (vi) dissolve or wind up the Company, (vii) admit any other members to the Company, (viii) transfer a percentage interest in the Company, except as provided in this Agreement, (ix) grant a security interest in any property of the Company or (x) take any act contrary to decisions made by Members at a special or annual meeting of Members.

3.5    Compensation.  The Manager shall receive no compensation for his services unless the Members unanimously agree otherwise.

## 4.0    INDEMNIFICATION

4.1    Third Party Actions.  The Company shall indemnify and defend any Member or Manager who is or was a party or who is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including all appeals, by reason of the fact that he is or was a Member, Manager or employee of the Company, against any and all expenses (including reasonable attorneys fees), judgments, decrees, fines, penalties, and amounts paid in settlement which were actually and reasonably incurred by him in connection with such action, suit, or proceeding, if he acted in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, he had no reasonable cause to believe his conduct was unlawful.  The termination of any action, suit or proceeding by judgment, order, settlement, conviction or plea or its equivalent shall not, by itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company.

4.2    Derivative Actions.  The Company shall indemnify any Member or Manager who is or was a party or who is threatened to be made a party, to any threatened, pending or completed action or suit, including all appeals, by or on behalf of the Company in order to procure a judgment in its favor by reason of the fact that he is or was a Member or Manager of the Company, against any and all expenses (including reasonable attorneys fees) which were actually and reasonably incurred by him in connection with the defense or settlement of such action or suit so long as he acted in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company; except that no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Company unless, and only to the extent that, the court in which such action or suit was brought shall determine upon application that despite the adjudication of liability and in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses as the court may deem proper.

4.3    Rights after Successful Defense.  To the extent that a Member or Manager has been successful on the merits or otherwise in defense of any action, suit or proceeding, he shall be indemnified against expenses (including reasonable attorneys fees), actually and reasonably incurred by him in connection therewith.  Any indemnification under Section 4.2 shall be made by the Company only as authorized in a specific case upon determination that indemnification of the Member or Manager is proper under the circumstances because he or she has met the applicable standard of conduct, and such determination shall be made by majority vote of the Members.

4.4    Expenses.  Expenses of each person indemnified hereunder, which were incurred in defending against a civil, criminal, administrative or investigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Company in advance of the final disposition of such action, suit or proceeding if authorized by the Members following receipt of a written undertaking by or on behalf of the Manager or Member being indemnified to repay such amount, unless it shall be ultimately determined that he is entitled to be

indemnified by the Company.

4.5     Nonexclusive. The indemnification provisions of this Section 4.0 shall not be deemed to be exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law.

4.6     Insurance. The Company may purchase and maintain insurance on behalf of any person who is a Manager or Member of the Company against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 4.0 or under the provisions of the laws of the State of New Jersey.

4.7     Notice. Any person who intends to seek indemnification by the Company pursuant to this Section 4.0 must give prompt notice to the Company of any claim, suit or action, and must fully cooperate with the Company in the defense of the claim, suit or action. Failure to comply with this Section 4.7 will relieve the Company of its indemnification obligations to the extent it is prejudiced by such failure.

## 5.0    CAPITAL AND L.L.C. PERCENTAGE INTEREST

5.1     Definitions. As used in this Operating Agreement "LLC Interest" shall refer to a Member's entire right, title and interest in the Company. "LLC Percentage Interest" shall mean, as to each Member, the percentage interest in the Company allocated to such Member on the books and records of the Company. The initial LLC Percentage Interest of each Member is set forth in Section 5.2.

5.2     Initial Capital Contribution and L.L.C. Percentage Interest. In exchange for their respective LLC Interest, each Member has contributed the monies and assets as follows, and each has acquired the following LLC Percentage Interest:

| Member | Initial Capital Contribution | Initial LLC Percentage Interest |
|--------|------------------------------|----------------------------------|
| Ilene  | $ _____                    | 67%                              |
| Sameh  | $ 100,000.00                 | 33%                              |

5.3     Additional Funding. To the extent feasible, if additional funds are needed by the Company, the Manager will endeavor to borrow those funds from a financial institution on such terms and conditions and at such interest rates as are approved by the Members at a special meeting called for that purpose.

5.4     Capital Call. If additional funding is not available from third parties as provided in Section 5.3 hereof or if the Manager deems it advisable to have a capital call, then the Manager may call upon the Members to contribute additional capital. Each Member shall contribute additional capital to the Company on a pro rata basis in proportion to his respective LLC Percentage Interest, whenever, in the opinion of the Manager, such additional funds are necessary to further the interests or to accomplish the business or purposes of the Company. Unless the Members unanimously agree otherwise, all additional capital contributions shall be in the form of money either by personal or bank check and shall be made within thirty (30) days after the giving of written notice by the Manager to the Members, in which notice the amount due and owing by each Member and the purpose for which the same is being requested shall be specified. If a Member fails to pay his additional contribution to the Company in accordance with the foregoing provision of this Section 5.4, the Member who has made the additional capital contribution shall elect to treat his additional contribution as either (i) a demand loan to the Company with simple interest at the prime rate of interest as published in the Wall Street Journal, which interest shall be paid by the Company to him on the last business day of each month, or (ii) a contribution to capital which shall result in the proportional increase of the LLC Percentage Interest of the contributing Member and a decrease of the LLC Percentage Interest of the non-contributing Member. Until the contributing Member makes the election as provided in the preceding sentence, the Company shall treat his contribution as a demand loan.

5.5     No Priority. No Member shall be entitled to withdraw or demand the return of any part of his capital contribution except with the written consent of the other Member. No Member shall have the right to demand or receive property other than cash in return for his capital contribution as a distribution of income.

4

No Member shall have priority over any other Member either as to the return of his capital contribution to the Company or as to any distributions. No interest shall be paid on any capital contribution.

5.6    Guaranty. In the event that a lending institution or creditor of the Company requires personal guaranties of the Members and only one Member provides that guaranty, then the LLC Percentage Interest of the guarantying Member shall be increased and the LLC Percentage Interest of the non-guarantying Member shall be decreased on the basis of one dollar for each four dollars guaranteed.

## 6.0    ALLOCATION OF PROFIT & LOSS AND DISTRIBUTIONS

6.1    Distributions of Cash Flow. The Manager shall make distributions of cash flow to Members and shall retain such funds in the Company as the Members deem necessary to cover the Company's reasonable business needs, which shall include reserves against possible losses and the payment or making provision for payment when due of obligations of the Company. Any cash flow distribution shall be made to the Members in accordance with their respective LLC Percentage Interests.

6.2    Allocations. Income from operations and losses from operations shall be allocated to the Members in accordance with their respective LLC Percentage Interests.

6.3    Capital Accounts. There shall be established and maintained on the books of the Company a capital account for each Member. The accountant for the Company will make adjustments to the capital account from time to time as he deems appropriate in accordance with generally accepted accounting principles, consistently applied. The accountant for the Company shall also maintain an account of the LLC Percentage Interest of each Member.

6.4    Fiscal Year. The fiscal year for the Company for both accounting and tax purposes shall be the calendar year ending on December 31 of each year.

6.5    Tax Election. The Company will be recognized as a partnership for federal and state tax purposes. No Member shall take any action or refuse to take any action which would cause the Company to forfeit the benefits of such tax election. If necessary, Ilene will be the "tax matters partner" for purposes of the Internal Revenue Code.

## 7.0    RESTRICTIONS ON TRANSFER AND ENCUMBRANCES

7.1    No Transfers or Encumbrances. Except as hereinafter provided in this Section 7, no Member may transfer or permit his LLC Interest or any part of it to be transferred to any third party. Any person into whose hands an LLC Interest shall fall shall automatically become bound by all of the terms and conditions of this Operating Agreement. No member may grant a security interest in his LLC Interest. No Member may pledge or otherwise encumber his LLC Interest or offer his LLC Interest as security for any debt or obligation.

7.2    Death. Upon the death of a Member, any appraisal right that may exist under law shall be deemed waived and the LLC Interest of the Member shall become a part of his estate and distributed in accordance with his will or, if there is no will, in accordance with the New Jersey laws of intestacy. The death of a Member shall be a ground for dissolution under Section 9.1 below, unless the surviving Member elects (within forty-five (45) days of the date of death) to continue the Company.

7.3    Permanent Disability. In the event of the permanent disability of a Member, his L.L.C. interest shall remain a part of his estate.

7.4    Withdrawal. In the event a Member wishes to withdraw from the Company, he will follow the procedure set forth in this Section 7.4.

a.    In no event may a Member seek to withdraw from the Company during the first two years of the Company's existence.

b.    If a Member wishes to withdraw, he shall notify the other Member of his desire to withdraw and shall offer the other Member the opportunity to purchase the withdrawing Member's LLC interest

at a price determined by the following formula: average earnings before interest, taxes, debt, and depreciation over the prior three years capitalized at a 9% rate of return times the withdrawing Member's LLC Percentage Interest. That offer shall remain open for one hundred eighty (180) days.

    c.    If the non-withdrawing Member declines to accept the offer at the price set forth in Section 7.4b within the 180 day period, then the withdrawing Member may offer his LLC Interest to a third party, subject to the right of first refusal set forth in Section 7.4d.

    d.    If the withdrawing Member receives an acceptable bona fide offer from a third party to purchase his LLC Interest, he shall offer to sell his LLC Interest to the non-withdrawing Member at the same price and terms and conditions as offered by the third party and shall provide the non-withdrawing Member with a copy of that offer. The non-withdrawing Member shall have the right to purchase the withdrawing Member's LLC Interest on the same terms and conditions as set forth in the third party offer, provided that he gives notice to the withdrawing Member of his intention to do so within thirty (30) days of receipt by the non-withdrawing Member of the written details of the third party offer.

    e.    If the non-withdrawing Member buys the LLC Interest of the withdrawing Member, then the non-withdrawing Member will indemnify the withdrawing Member with respect to any personal guaranties the withdrawing Member may have given for obligations of the Company.

    f.    If the non-withdrawing Member buys the LLC Interest of the withdrawing Member, then the closing on the purchase will take place at the principal office of the Company within ninety (90) days of the date the non-withdrawing Member accepts the offer.

    7.5    <u>Conditions Applicable to Transfers</u>. Notwithstanding anything to the contrary containing in this Operating Agreement:

    a.    Any sale, assignment or transfer, whether direct or indirect, of any LLC Interest shall be made in full compliance with all applicable statutes, rules and regulations and in full compliance with any mortgage or loan agreement affecting the Business;

    b.    No change in ownership of an LLC Interest of any Member shall be binding upon the Company or any other Member unless and until (i) true copies of the instrument or instruments of transfer executed and delivered pursuant to or in connection with such transfer shall have been delivered to the Manager, (ii) the transferee shall have delivered to the Manager an executed and acknowledged assumption agreement pursuant to which the transferee assumes all of the obligations of the transferor hereunder and agrees to be bound by all of the provisions of this Operating Agreement, (iii) the Manager shall have consented thereto, and (iv) the transferee shall have executed, acknowledged and delivered any instrument required by law to effect such transfer.

    7.6    <u>Transferees by Operation of Law</u>. If, notwithstanding the provisions of Section 7.0, any person acquires all or any part of the LLC Interest of any Member in violation of this Section 7.0, by operation of law or judicial proceeding, the holder of said LLC Interest shall be entitled only to receive the share of income, losses and cash flow to which said Member would otherwise have been entitled, and said person shall have no right whatsoever to participate in the management, business or affairs of the Company and no right to vote on any matters coming before the Company.

    7.7    <u>Waiver</u>. In the event of the resignation or withdrawal of a Member, the rights of the resigning or withdrawing Member shall be governed by this Article 7.0, and the Member shall not have any right to compel the Company to pay him the fair value of his interest in the Company, and the Member shall not have any right to compel the Company to return his capital contribution to him, and any statute or law entitling him to such payment is waived.

## 8.0   DEFAULT

    8.1    <u>Notice and Cure</u>. In the event of any breach of the obligations, terms or conditions of this Operating Agreement by a Member, the other Member shall give the defaulting Member notice of the default

in writing with sufficient detail as to the nature of the default, and the defaulting Member shall have thirty (30) business days within which to cure the default.

    8.2   <u>Remedies</u>. In the event that the defaulting Member fails to cure the default within the period permitted by Section 8.1, then the non-defaulting Member shall have the following remedies:

        a.    Any rights and remedies as provided in this Operating Agreement;

        b.    Any rights and remedies as provided by law;

        c.    The right to expel the defaulting Member from the Company and buy out his LLC Interest on the following basis:

           (1)    The non-defaulting Member shall give written notice of his exercise of his rights under this section to the defaulting Member;

           (2)    The price for the purchase of the defaulting Member's LLC Interest shall be the price as established pursuant to Section 7.4b above, except that the cap rate shall be 11% instead of 9%, and the price shall be further reduced by the cost to redress the damage to the Company caused by the default of the defaulting member and the costs and expenses of the expulsion process;

           (3)    The closing on the purchase shall take place at a time and place as determined by the non-defaulting Member, which time shall be no sooner than 10 business days after the end of the cure period and no later than 60 days after the end of the cure period. The purchase price will be paid by way of a promissory note over a five year term beginning 180 days after the date of closing with payments on a monthly basis consisting of one-sixtieth of the principal each month and interest on the unpaid balance each month at the rate of the prime rate of interest, per annum. No payments will be made during the first 180 days after the closing and no interest will accrue during that period.

## 9.0   TERMINATION

    9.1   <u>Termination</u>. The Company shall be terminated and dissolved upon:

        a.    The unanimous vote of all Members holding an interest in the Company;

        b.    The filing by the Company for protection under any bankruptcy or insolvency law;

        c.    The death of both Members within sixty days of each other;

        d.    As otherwise provided in this Operating Agreement.

    9.2   <u>Continuing Governance</u>. In the event of the dissolution of the Company, the business affairs of the Company shall continued to be governed by the terms of this Operating Agreement during the winding up of the Company's business and affairs. If a trustee in dissolution or receiver is appointed to wind up the affairs of the Company, the Manager shall be the person so appointed, unless he is in default or is the cause of the dissolution.

## 10.0   GENERAL PROVISIONS

    10.1.   <u>Notices</u>. Any notices required pursuant to this Agreement shall be in writing and shall be sent by any two of the following methods: (I) certified mail, return receipt requested, (ii) regular mail, (iii) Federal Express or other nationally recognized courier service, and (iv) hand delivery. All notices to the Company shall also be sent to the other Member.

        All notices to Ilene shall be sent to:

        541 Berkshire Valley Road

        Wharton, New Jersey 07885

or such other address as Ilene may notify the Company and the other Member.

        All notices to Sameh shall be sent to:

        6900 Georgia Avenue

7

NW Malone House
Washington, D.C. 20307
or such other address as Sameh may notify the Company and the other Member.

10.2    _Further Assurances._ Each party hereto shall execute, acknowledge and deliver such further certificates, instruments, agreements or other documents and take such further action as may be required in order to carry out the purposes of the Company and the intentions of this Operating Agreement.

10.3    _No Partition._ Each Member hereby permanently waives and relinquishes any and all rights he may have to cause all or any part of the property of the Company to be partitioned. It is the intention of the Members to prohibit any Member from bringing a suit for partition against any other Member.

10.4    _Waiver._ No consent or waiver, express or implied, by any Member or by the Manager to or of any breach or default by any other Member or of the Manager in the performance by any other Member or Manager of his obligations hereunder shall be deemed or construed to be a consent to or a waiver of any other breach or default in the performance by such other Member or Manager of the same or any other obligation of such Member or Manager hereunder. Failure on the part of a Member or Manager to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member or Manager of his rights hereunder.

10.5    _Severability._ If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, and such remaining provisions may be equitably reformed by the court.

10.6    _Choice of Law._ This Agreement and all matters relating to the Company shall be governed and construed in accordance with the laws of the State of New Jersey.

10.7    _Entire Agreement._ This Agreement constitutes the entire Agreement amongst the parties hereto and may not be modified or amended except in writing and signed by all of the Members.

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the day and year first above written, intending to be legally bound.

Signed, sealed and delivered in the
presence of:

_____          _____
                  , Witness                Ilene Morris-Sambur


Signed, sealed and delivered in the
presence of:

_____          _____
                  , Witness                Sameh Fawzy


8

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Complaint was served by regular United States mail, postage prepaid, this _15_ day of January, 2008 upon the party listed below:

> Robert Sylvor, Esq.
> Sylvor & Richman, LLP
> 605 Third Avenue
> New York, NY 10158
>
> Creating Opportunities by Recognizing Abilities
> 541 Bershire Valley Road
> Wharton, New Jersey 07885

_Yvonne Stewart_
Yvonne Stewart

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

| I (a) PLAINTIFFS | DEFENDANTS    CLERK |
|---|---|
| Sameh Fawzy    11001 | Ilene Morris-Sambur and Creating Opportunities by Recognizing Abilities |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF    D.C.
(EXCEPT IN U.S. PLAINTIFF CASES)    (11001)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT  11 2   88888
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Donna M. Drake
Howrey LLP
1299 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 383-7061

Case: 1:08-cv-00083
Assigned To : Roberts, Richard W.
Assign. Date : 1/15/2008
Description: Contract

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
Plaintiff

○ 3 Federal Question
(U.S. Government Not a Party)

○ 2 U.S. Government
Defendant

◉ 4 Diversity
(Indicate Citizenship of
Parties in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ◉ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ◉ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ◉ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV.  CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and <u>one</u> in a corresponding Nature of Suit)**

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ○ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

— O —

| ○ G. Habeas Corpus/ 2255 | ○ H. Employment Discrimination | ○ I. FOIA/PRIVACY ACT | ○ J. Student Loan |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. Labor/ERISA (non-employment) | ○ L. Other Civil Rights (non-employment) | ◉ M. Contract | ○ N. Three-Judge Court |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☒ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

*28 USC 1332*

**VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)**
This case involves a breach of contract, misrepresentation and intentional infliction of emotional distress. Jurisdiction is proper under F.R.C.P. §

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | DEMAND $ *320,000 plus fees + costs + interest* | Check YES only if demanded in complaint<br>JURY DEMAND:  YES ☐   NO ☒ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY** (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE *1/15/08*    SIGNATURE OF ATTORNEY OF RECORD *Donna Dill*

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.