**IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SAMEH FAWZY )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ILENE MORRIS-SAMBUR and CREATING )<br>OPPORTUNITIES BY RECOGNIZING )<br>ABILITIES, LLC )<br>)<br>Defendants. )<br>) | Case No. 1:08-cv-00083 (RWR)<br><br>**FIRST AMENDED<br>COMPLAINT** |

Plaintiff, by and through his undersigned attorneys, allege against Defendants on information and belief as follows:

**THE PARTIES**

1.      Plaintiff Sameh Fawzy is an individual currently residing in the State of Virginia at 13798 Autumn Glory Court, Chantilly, VA 20151.

2.      On information and belief, Defendant Ilene Morris-Sambur is an individual residing at 541 Bershire Valley Road, Wharton, New Jersey 07885.

3.      On information and belief, Defendant Creating Opportunities by Recognizing Abilities, LLC ("CORA") is a corporation organized and existing under the laws of the State of New Jersey with its principle office located at 541 Bershire Valley Road, in the City of Wharton, State of New Jersey 07885.

4.      Plaintiff is informed and believes and thereon alleges that, at all times herein mentioned, each of the Defendants sued herein was the agent and employee of the other Defendant and was at all times acting within the purpose and scope of such agency and employment.

**JURISDICTION AND VENUE**

5.      This action is brought to recover damages for a course of conduct where the overwhelming amount of the parties' conduct occurred within the District of Columbia.  In particular, the Defendants solicited contact with Plaintiff in the District of Columbia; the parties had frequent contact either in person, by telephone or email where at least one the parties was located within the District of Columbia; the contract at issue was signed by Plaintiff while he was residing within the District of Columbia; and lastly, Plaintiff was, at all relevant times, a resident in the District of Columbia.

**NATURE OF ACTION**

6.      Plaintiff is a 31 year-old veteran, who was undergoing medical and psychological treatment at Walter Reed Army Medical Center ("Walter Reed") for injuries sustained while serving combat duty in Iraq.  After approximately 18 months of psychological and other medical treatment at Walter Reed, Plaintiff was ready to begin the transition back to civilian life and participated in a job fair sponsored by Walter Reed. It was at this job fair where Plaintiff first encountered Morris-Sambur, who was also participating in the job fair representing her company, CORA.

7.      During the December 2006 job fair, Morris-Sambur initiated her scheme to deceive Plaintiff by gaining his trust and ultimately talking him into turning over to her a total of $70,000 – basically all the money Plaintiff had in his possession and the maximum amount of cash he was able to advance from his credit cards.

8.      Morris-Sambur's conduct was particularly malicious because at all times during her dealings with Plaintiff, she had full knowledge of Plaintiff's psychological and physical condition and ongoing treatment, and nonetheless took complete advantage of a recuperating solider trying to reintegrate back into society after returning from combat duty in Iraq.

2

9.      Walter Reed periodically sponsors job fairs to help injured soldiers who are ready to leave the hospital to find employment suitable to their individual injuries and/or stages of recuperation.  Employers who are willing and able to offer these types of employment opportunities are invited to participate in Walter Reed's job fairs.

10.     The employers who participate in Walter Reed's job fairs are fully aware that the individuals with whom they will be interviewing are undergoing treatment at Walter Reed because of physical or psychological injuries and are expected to interact with these individuals in a fair and conscientious manner.

11.     During Walter Reed's December 2006 job fair, Morris-Sambur spoke to Plaintiff about potential employment opportunities with her company CORA.   Plaintiff explained to Morris-Sambur that he was looking for employment where he could work primarily from home because being out in the public caused him severe stress.  Plaintiff was suffering from psychological trauma that made it very difficult for him to interact with people.  Morris-Sambur told Plaintiff that CORA was a good fit for him because he could perform telemarketing from his hospital room until he was ready to move out and could continue to work for CORA once he was home.

12.     At the conclusion of their conversation, Morris-Sambur asked Plaintiff to leave his contact information so that they could talk further about his employment with CORA.

13.     Over the next few weeks, Plaintiff and Morris-Sambur communicated several times on the telephone and through email correspondence.  During these conversations, Morris-Sambur engaged in a scheme to gain Plaintiff's trust. Though the parties had known each other for a couple of weeks, Morris-Sambur told Plaintiff that he was "part of her family" and that she "only wanted to do what was best for him" and often concluded her email correspondence with "hugs Ilene."

3

14.    During the course of these conversations, Morris-Sambur made several misrepresentations to Plaintiff regarding the financial success of CORA. Morris-Sambur falsely told Plaintiff that CORA had recently been awarded a number of contracts to perform telemarketing that now needed to be staffed. Specifically, Morris-Sambur stated that CORA had just been awarded a contract from the government worth $2 million in revenue to CORA. Morris-Sambur also falsely contended that CORA had continuing contracts for vocational rehabilitative training with more than fifteen different states.

15.    Morris-Sambur contended that these contracts were going to make CORA a lot of money and urged Plaintiff to take advantage of these alleged profits by investing in CORA. Morris-Sambur made these representations knowing that they were false and with the purpose of deceiving Plaintiff into "investing" in CORA.

16.    Morris-Sambur told Plaintiff that if he bought a partnership interest in CORA he would be able to draw a salary by doing telemarketing from home. In addition, Morris-Sambur represented that as a part-owner, he would share in CORA's purportedly vast profits. Morris-Sambur promised Plaintiff that given CORA's backlog of contracts he could work from home and make as "much money as he chose to make."

17.    By January 2007, Morris-Sambur had convinced Plaintiff to invest in CORA. Plaintiff agreed to invest in CORA because he had grown to trust Morris-Sambur and viewed this opportunity as a much needed "life-line" where he could earn a salary while working from home and also share in CORA's profits, which would help him to regain his financial security.

18.    By facsimile dated January 30, 2007, Morris-Sambur forwarded Plaintiff an Operating Agreement ("Agreement") that created CORA, LLC. (Attachment 1, hereto). The Agreement required Plaintiff to pay $100,000 in exchange for a 33%

ownership interest in CORA.  Morris-Sambur, though she was not making any capital

contribution, was given a 67% interest in CORA and essentially sole control of CORA.

19.    The Agreement was drafted by Morris-Sambur's counsel.  The terms of

the Agreement were entirely one-sided, giving Morris-Sambur all the decision-making

power and control over the finances.  For example, the Agreement provided that Morris-

Sambur would make all the decisions (Agreement ¶ 3.4) and could unilaterally require

additional capital calls that requiring Plaintiff to invest additional funds.  (Agreement ¶

5.4).

20.    On information and belief, Morris-Sambur has made public

representations that CORA is a non-profit company, however the Agreement that

purportedly created CORA defines the company as Limited Liability Company that for

tax purposes is to be recognized as a partnership, and that all profits are to be divided

based on share of ownership.  (Agreement ¶ 1.0).

21.    In February, without advice from counsel, Plaintiff signed the Agreement

and wired to Morris-Sambur $70,000.  Plaintiff obtained $27,000 in cash by closing out

all of his savings accounts and a Certificate of Deposit.  In addition, at Morris-Sambur's

urging, Plaintiff took out cash advances on all of his available credit cards totaling

approximately $43,000.  On average the credit card companies are charging Plaintiff an

average annual interest rate of approximately 15% on the outstanding balances.

22.    Over the next two months, Morris-Sambur repeatedly pressured Plaintiff

to contact friends and family members to try to obtain the remaining $30,000.  Plaintiff

was not able to do so and ultimately paid only $70,000 out of the $100,000 specified in

the Agreement.

23.    Despite making several requests to Morris-Sambur, Plaintiff never

received a signed copy of the Agreement back from Morris-Sambur.  In addition,

DM_US:21285864_2

although Morris-Sambur promised Plaintiff that she would provide him with stock certificates, Plaintiff never received any stock certificates.

24.    During March and April 2007, Plaintiff did some work for CORA from his hospital room at Walter Reed, which consisted mainly of data entry and some telemarketing.  However, now that Morris-Sambur had possession of the $70,000, she started shutting Plaintiff out of the business operations of CORA by, *inter alia*, refusing to take his calls, ignoring his emails, and even refusing to accept certified letters from Plaintiff.

25.    During March and April 2007, Plaintiff learned that Morris-Sambur had misrepresented the contracts she claimed had been awarded to CORA.  In fact, because there were no contracts that needed staffing, there was little work for Plaintiff.  Instead, Morris-Sambur now claimed that she was unable to interact with Plaintiff or answer his questions, because she was constantly in meetings attempting to get contracts – the same contracts she had previously stated had already been awarded to CORA.

26.    During this time, Plaintiff started experiencing increased psychological and physical problems that were impeding his recovery.  On or about May 29, 2007, Plaintiff informed Morris-Sambur that he wanted to terminate his relationship with CORA and requested that his $70,000 be returned.  Morris-Sambur refused, claiming that she had spent all of the money.

27.    Plaintiff pleaded with Morris-Sambur, explaining that he was soon going to be released from Walter Reed and needed money for a place to live.  Morris-Sambur steadfastly refused Plaintiff's requests to return the $70,000.

28.    Presently Plaintiff has no savings, no employment and not enough money to secure living arrangements.

6

29.    Had Plaintiff been aware of the true facts, he would have not agreed to invest in CORA.  As a direct and proximate result of Plaintiff's dealing with Defendants, he has suffered and continues to suffer from loss of money, loss of employment, stress, anxiety, loss of sleep, and other mental, emotional and financial distress.

30.    On information and belief, a contributing factor to CORA's refusal to return Plaintiff's $70,000 is the fact that Morris-Sambur used a very large portion of it for her and her family's personal expenses.  In 2007, CORA provided Morris-Sambur over $49,000 in loans for personal expenses unrelated to CORA, over $12,000 in loans to Morris-Sambur's husband, and spent over $28,000 for two rental properties, one of which is a horse farm in Virginia where Morris-Sambur's son resides.  Morris-Sambur also paid herself a salary as Manager, despite the fact that CORA's Operating Agreement explicitly prohibits the Manager from receiving a salary.  (Agreement ¶ 3.5).

## FIRST CAUSE OF ACTION
### Fraudulent Misrepresentation

31.    The allegations contained in paragraphs 1 – 30 are incorporated herein by reference.

32.    Plaintiff is informed and believes, and thereon alleges, that at all times mentioned Morris-Sambur was the agent of CORA and was at all times acting within the purpose and scope of such agency.

33.    From December 2006 continuing through February 2007, Defendants knowingly made a series of misrepresentations regarding the financial success, contracts that had been awarded, and overall profitability of CORA.

34.    Specifically, in January 2007, Defendants alleged that CORA had been awarded a $2 million contract by the government that needed to be staffed by CORA.

DM_US:21285864_2

Defendants further alleged that this contract would substantially increase CORA's profitability.

35.    In January 2007, Defendants also knowingly misrepresented that CORA had been awarded vocational rehabilitative training contracts in some fifteen states that also needed to be staffed by CORA.  Defendants further alleged that these contracts would increase CORA's profitability.

36.    At the time Defendants made these misrepresentations, Defendants knew they were false, and made these representations with the principle intent and purpose of deceiving Plaintiff into turning over money to Defendants.

37.    Defendants were aware of Plaintiff's medical issues and intentionally and maliciously used that knowledge to persuade Plaintiff to act in a manner that they knew would harm him.

38.    At the time these misrepresentations were made, Plaintiff did not know, and no reason to know that Defendants' statements regarding CORA were false.  Had Plaintiff known the true facts regarding CORA's financial situation, he would not have agreed to turn over $70,000 to Defendants.

WHEREFORE, Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## SECOND CAUSE OF ACTION
### Breach of the Implied Covenant of Good Faith and Fair Dealing

39.    The allegations contained in paragraphs 1 - 38 are incorporated by reference.

8

40.     Plaintiff and Defendants entered into a contract that is referred to above as the Agreement (Attachment 1).  By the above actions, Defendants have willfully  and knowingly breached their implied covenant of good faith and fair dealing owed to Plaintiff .

41.     Plaintiff has been and continues to be irreparably harmed as a result of Defendants' breach of the implied covenant of good faith and fair dealing.  Plaintiff has been damaged in an amount which cannot be fully determined at this time, but which, in any event, exceeds $70,000.

42.     As a result of Defendants' breach, Plaintiff was deprived the benefits that he reasonably expected by entering into the Agreement with Defendants.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

### THIRD CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

43.     The allegations contained in paragraphs 1 – 42 are incorporated by reference.

44.     Defendants were fully aware that Plaintiff was receiving psychological and other medical treatment as a result of serving combat duty in Iraq and was, in fact, still residing at Walter Reed hospital at the time they induced Plaintiff to invest in CORA.

45.     By participating in Walter Reed's job fair and holding CORA out as a company that is willing, and able to help soldiers recuperating from injuries and in need

of special employment opportunities, and also as a potential employer and business associate, Defendants owed Plaintiff a duty of care.

46.    Defendants nevertheless engaged in their scheme and knowingly took advantage of Plaintiff's impaired mental and emotional state, and acted in a manner they knew would result in extreme emotional distress to Plaintiff.

47.    Defendants knew that because of Plaintiff's medical condition, the failure to exercise due care in the performance of business dealings with Plaintiff would cause Plaintiff emotional distress.

48.    Defendants' actions proximately caused Plaintiff to suffer severe emotional distress and aggravated his existing medical and psychological condition.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.


**FOURTH CAUSE OF ACTION**
**Securities Fraud Under Section 10(b)(5) of the Securities Exchange Act**

49.    The allegations contained in paragraphs 1 - 48 are incorporated by reference.

50.    Defendants intentionally engaged in a practice to defraud Plaintiff in connection with the purchase of shares in CORA and thereby violated the terms of Section 10(b)(5) of the Security Exchange Act of 1934.

51.    Defendants intentionally made false statements regarding the profitability of CORA and their scheme to appropriate Plaintiff's money was clearly tied to the

purchase of shares of stock in CORA, or to the creation of a profit-sharing agreement or investment contract relating to CORA.

52.    Defendants' receipt of the monies paid by Plaintiff was directly in connection with the purchase of shares in CORA, or to the creation of a profit-sharing agreement or investment contract relating to CORA.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

**FIFTH CAUSE OF ACTION**
**Violation of the New Jersey Limited Liability Companies Act**

53.    The allegations contained in paragraphs 1-52 are incorporated by reference.

54.    In accordance with his rights under Section 42:2B-24 of the New Jersey Limited Liability Act, Plaintiff made multiple written demands to Defendants requesting a copy of CORA's Operating Agreement as well as information related to its financial records and business operations. These requests were made on February 7, 2008, March 12, 2008, and May 12, 2008. Defendants never provided Plaintiff with any of the information requested in response to the February 7 and March 12 inquiries, despite their legal obligation to do so. Defendants replied with only a limited set of information in response to the May 12, 2008 request.

55.    Defendants' inability to fulfill their duties to provide members with information concerning the financial health and business operations of the company in a

11

56.     Defendants engaged in wrongful conduct previously detailed above that adversely impacted the business, including the use of corporate expenses to pay personal expenses and make personal loans to Sambur and her family.  This conduct materially affected CORA's business by depriving it of assets.

57.     Defendants engaged in wrongful conduct by awarding Sambur a salary despite explicit provisions of the Operating Agreement that prohibit the manager from receiving a salary and require distributions to divided amongst all members reflecting their respective share of the company.  (Agreement ¶¶s 3.5, 6.1).

WHEREFORE, the Plaintiff prays for judgment against Defendants, ordering Defendants' expulsion as a member of CORA by judicial determination in accordance with Section 42:2B-24-b-3 of the New Jersey Limited Liability Company Act due to Defendants' wrongful conduct that adversely affected CORA, and due to the fact that Defendants' conduct makes it not reasonably practicable to conduct business with Defendants as a member.

**SIXTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**

58.     The allegations contained in paragraphs 1-57 are incorporated by reference.

59.     Defendants created a fiduciary relationship with Plaintiff by virtue of Defendants' superior business knowledge, Plaintiff's psychological impairment, the familial nature of the connection Defendants sought to establish with Plaintiff, and by

DM_US:21285864_2

entering into a business relationship with Plaintiff in which Defendants exercised primary control over the business entity.

60.    Through the relationship established by Defendants with Plaintiff, Defendants occupied a superior position with respect to Plaintiff.  Defendants held a position of trust with Plaintiff and took it upon themselves to act on Plaintiff's behalf. Defendants therefore owed Plaintiff a duty to exercise reasonable skill and care and had a duty of loyalty to Plaintiff with respect to these relations.

61.    Defendants breached the duty of care they owed to plaintiff by making false statements about CORA's current and future earnings and profitability.  Defendants' manipulation of their superior position of trust with respect to Plaintiff to induce Plaintiff to enter into a business relationship based on misinformation is completely inconsistent with the duty of care Defendants owed to Plaintiff.

62.    Defendants breached the duty of care owed to plaintiff by managing the business solely for the benefit of Defendants and to Plaintiff's detriment, distributing various forms of payment to Morris-Sambur and her family, while withholding similar allowances from Plaintiff.

63.    Defendants violated their duty of loyalty to Plaintiff by engaging in self-dealing in the form of loans made to Morris-Sambur and her family.  Defendants' duty of loyalty requires that they not engage in self-dealing to the detriment of Plaintiff.  By opting to make personal loans to Morris-Sambur and her family, on terms determined by Defendants, Defendants acted in the interests of Morris-Sambur and her family to the detriment of the financial well-being of both Plaintiff and CORA.

64.    All of Defendants actions in violation of its fiduciary duties were carried out with reckless disregard for Plaintiff's rights.  Defendants intentionally carried out these actions for their benefit and at Plaintiff's expense.

DM_US:21285864_2

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## SEVENTH CAUSE OF ACTION
### Breach of Contract

65.    The allegations contained in paragraphs 1-64 are incorporated by reference.

66.    On January 30, 2007, Defendants and Plaintiff entered into a written agreement, attached hereto as Attachment 1 and made a part hereof.  This agreement constituted CORA's Operating Agreement, which outlined the rights and duties of the company's members.

67.    Defendants failed to hold an annual meeting on the last business day of 2007, as required by the agreement.  (Agreement ¶ 2.1).  Plaintiff made numerous written demands for information regarding such a meeting, but Defendants failed to provide any response on this subject.

68.    Defendants failed to hold an election at the end of 2007 for CORA's Manager, as required by the agreement.  (Agreement ¶ 3.2).

69.    Defendants failed to establish and maintain capital accounts for each member of the company, as required by the agreement.  (Agreement ¶ 6.3).

70.    Defendants paid Morris-Sambur a salary, which was expressly prohibited by the agreement.  (Agreement ¶ 3.5).

71.    As a result of these breaches of the agreement by Defendants, Plaintiff has been denied the ability to monitor whether CORA is properly managed and has been

prevented from taking appropriate action to protect his interests.  Plaintiff has further been injured by Defendants' failure to abide by the prohibition on managers receiving a salary.  Due to Defendants' breaches of the agreement, Plaintiff has suffered damages in excess of $70,000.

72.    Despite Defendants' failures to uphold their duties as required under the agreement, Plaintiff has fulfilled all of his contractual obligations.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, plus fees and other costs that the Court deems appropriate.

## EIGHTH CAUSE OF ACTION
### Violation of New Jersey Uniform Securities Law

73.    The allegations contained in paragraphs 1-72 are incorporated by reference.

74.    Defendants sold shares in CORA by means of untrue statements about the current and future profitability of CORA and thereby violated the terms of Section 49:3-71 of the New Jersey Uniform Securities Law.

75.    Defendants knew of the untruth of their statements regarding the profitability of CORA and intended to deceive the Plaintiff.

76.    Defendants' untrue statements caused the Plaintiff to suffer a financial detriment.  Had Plaintiff been aware of the truth of CORA's financial prospects, he would not have purchased his interest in CORA.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is

15

paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

## NINTH CAUSE OF ACTION
### Negligent Misrepresentation

77.    The allegations contained in paragraphs 1 - 76 are incorporated by reference.

78.    Defendants owed a duty of care in presenting financial information about CORA to Plaintiff in its attempt to secure Plaintiff's investment.

79.    Defendants negligently provided Plaintiff with false information regarding the profitability of CORA in representing that CORA had certain contractual commitments that it did not, in fact, have.

80.    Plaintiff was a reasonably foreseeable recipient of the false information about CORA's profitability spread by Defendants.

81.    Plaintiff justifiably relied on Defendants' false information when he purchased an interest in CORA.

82.    Defendants' false statements proximately caused Plaintiff damages in the form of the $70,000 he expended to purchase his interest in CORA.

83.    Defendants' false statements were made with reckless disregard for Plaintiff's wellbeing.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, together with punitive damages in the amount of $250,000, plus fees and other costs that the Court deems appropriate.

DM_US:21285864_2

**TENTH CAUSE OF ACTION**
**Equitable Fraud**

84.    The allegations contained in paragraphs 1 - 83 are incorporated by reference.

85.    Defendants attempted to induce Plaintiff to invest in CORA by misrepresenting presently existing facts and past facts about CORA's financial prospects, including false claims about valuable contracts that CORA had been awarded.

86.    Defendants intended for Plaintiff to rely on these statements.  The false claims about contracts CORA had already been awarded were made as a means to convince Plaintiff that CORA was a business in which he should invest his money.

87.    Plaintiff relied to his detriment on these statements.  Without the valuable contracts Defendants claimed CORA had already been awarded, CORA proved to be an unsuccessful business.  Plaintiff did not receive any positive return on his investment, and instead was saddled with significant debt without strong prospects for any future income.

WHEREFORE, the Plaintiff prays for judgment against Defendants, ordering the contract rescinded and the parties returned to their prior position, restoring Plaintiff's $70,000, plus interest calculated from January 2007 until the date said judgment is paid, at a rate of 15%, plus fees and other costs that the Court deems appropriate.

**ELEVENTH CAUSE OF ACTION**
**Conversion**

88.    The allegations contained in paragraphs 1 - 87 are incorporated by reference.

89.    Plaintiff owned a proportional share of the profits that CORA earned over the course of 2007.

17

90.    By opting to take all of CORA's profits and turn them into payments to Morris-Sambur and her family in the form of loans and other personal expenses, Defendants assumed ownership of profits that rightfully belonged to Plaintiff without Plaintiff's permission.

91.    Defendants' misappropriation of Plaintiff's profits excluded Plaintiff, the rightful owner of the profits, from exercising dominion over them.

WHEREFORE, the Plaintiff prays for judgment against Defendants in the amount of the profits to which Plaintiff would have been entitled had Defendants not improperly appropriated CORA's profits for personal uses, the specific amount of which is yet to be determined but is, in any case, in excess of $61,000.00.

DM_US:21285864_2

## PRAYER FOR RELIEF

Plaintiff, prays for judgment against Defendants, jointly and severally, for the damages alleged herein and in such amount as the evidence may show at the time of trial, together with costs, fees, prejudgment interest at the rate allowed by law, and for such other further relief, special and general, at law and in equity, to which Plaintiff shows himself justly entitled.

DATED:        June 20, 2008

*For Plaintiff Sameh Fawzy*

HOWREY LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004
(202) 383-6848 – Telephone
(202) 383-6610 – Facsimile

BY: /s/ Dawn A. Ellison
    DAWN ELLISON
    *Pro Bono Representation***
    DC Bar No. 464296
    ellisond@howrey.com

BY: /s/ Martin Cunniff
    MARTIN CUNNIFF
    USDC DC Bar No. 424219
    cuniffm@howrey.com

*** I am filing this complaint in accordance with  LCvR 83.2(g) and hereby certify that I am representing Plaintiff on a pro bono basis and am not receiving any compensation.*

19

**CERTIFICATE OF SERVICE**

I hereby certify that on this 20th  day of June, 2008, a true and correct copy of the foregoing Complaint was served by regular United States mail, postage prepaid, and by email upon counsel for Defendants.

/s/ James L. Layman
James L. Layman

# LYON, GLASSMAN, LEITES & MODI, L.L.C.

### ATTORNEYS AT LAW

256 COLUMBIA TURNPIKE
SUITE 103, SOUTH TOWER
FLORHAM PARK, NEW JERSEY 07932

REXFORD L. LYON
ELIANA M. LEITES*
DEVANSHU L. MODI*
ANTHONY G. WAHL

(973) 822-1822
Fax (973) 822-9212
www.lglmlaw.com

OF COUNSEL
MAX GLASSMAN

*Admitted NJ and NY

January 30, 2007

Via Facsimile (877-772-3727)
Ilene Morris-Sambur
CORA, L.L.C.
541 Berkshire Valley Road
Wharton, New Jersey 07885

Re:    Operating Agreement

Dear Ilene:

Enclosed please find a revised Operating Agreement.

As always, please contact me with any questions.

Thank you.

Very truly yours,

LYON, GLASSMAN, LEITES & MODI, L.L.C.

Devanshu L. Modi

DLM/jce

**FAWZY000001**

# Operating Agreement
# Creating Opportunities by Recognizing Abilities, L.L.C.

THIS OPERATING AGREEMENT is made as of this _____ day of _____, 2007, by and between Ilene Morris-Sambur residing at 541 Berkshire Valley Road, Wharton, New Jersey 07885(hereinafter referred to as "Ilene") and Sameh Fawzy residing at 6900 Georgia Avenue, NW Malone House, Washington D.C., 20307 (hereinafter referred to as "Sameh") (both hereinafter referred to as the "Members").

WHEREAS, Ilene Morris-Sambur and Sameh Fawzy are the sole Members of Creating Opportunities by Recognizing Abilities, L.L.C., a limited liability company organized under the laws of the State of New Jersey.

WHEREAS, the Members have agreed that Ilene Morris-Sambur will serve as the Manager of the limited liability company as more particularly set forth in this Operating Agreement.

WHEREAS, the parties wish to establish the relationship between the Members and the relationship between the Company and the Manager, all as more particularly set forth in this Operating Agreement.

NOW THEREFORE, the parties agree as follows:

## 1.0 FORMATION

    1.1    Name. The name of the limited liability company is Creating Opportunities by Recognizing Abilities, L.L.C. (hereinafter referred to as the "Company").

    1.2    Business. The Company is formed to engage in the business of providing telework training, placement and supervision (hereinafter referred to as the "Business").

    1.3    Certificate of Formation. Attached hereto and made a part hereof is the Certificate of Formation of the Company filed in the Commercial Recording Bureau of the Office of the State Treasurer of the State of New Jersey.

    1.4.    Term. The term of this Company shall commence on the date of the filing of the Certificate of Formation and shall continue in existence until terminated pursuant to the provisions of this Operating Agreement. Unless terminated pursuant to the provisions of this Operating Agreement, the existence of the Company shall be perpetual.

    1.5    Registered Agent and Office. The Company's registered Agent shall be Ilene, and its registered office shall be 541 Berkshire Valley Road, Wharton, New Jersey 07885, New Jersey or such other person or place as may be designated from time to time by the Manager.

    1.6    Place of Business. The principal office of the Company shall be 541 Berkshire Valley Road, Wharton, New Jersey 07885, New Jersey, or at such other place as may be designated from time to time by the Manager.

## 2.0 MEMBERS

    2.1    Annual Meeting. The annual meeting of the Members of the Company for the purposes of considering proposals laid before such meeting, electing a Manager for the ensuing year, and transacting such other business as may properly be brought before such meeting shall be held at the principal office of the Company or at such other convenient place, either within or without the State of New Jersey, as may be designated by the Manager and specified in the notice of such meeting. The annual meeting will be held on the last business day of December of every year.

    2.2    Special Meetings. Special meetings of the Members of the Company may be held when called by the Manager or by any of the Members. Upon request in writing delivered either in person or by certified mail, return receipt requested by any Member to the Manager, the Manager shall forthwith cause notice to be given to all members entitled to notice of the upcoming meeting. The meeting shall be held on a date not less

FAWZY000002

than three (3) nor more than twenty (20) days after the receipt of such request as the Manager may fix. If notice is not given by the Manager within three (3) days after the delivery or mailing of the request, the person or persons requesting the meeting may fix the time of the meeting and give notice thereof in the manner provided by law or by this Operating Agreement. Each special meeting shall be called to convene between 8:00 a.m. and 6:00 p.m. and shall be held at the principal office of the Company.

    2.3    Notice of Meetings. Not less than three (3) nor more than sixty (60) days before the date fixed before a meeting of Members, written notice stating the time and place of the meeting, and, in the case of a special meeting, the purpose of such meeting, shall be given to each Member entitled to vote thereat.

    2.4    Voting.

        a.    Each Member shall have one vote for each LLC Percentage Interest point owned by that Member. All decisions of the Members shall be made by way of majority of LLC Percentage Interests, except where this Operating Agreement requires unanimous decision by the Members. "LLC Percentage Interest" is defined in Section 5.1 and 5.2 below.

        b.    The following decisions shall require the unanimous vote of all the Members:

            (i)      amendment of this Operating Agreement;

            (ii)     sale of the Business to a third party;

            (iii)    dissolution of the Company.

    2.5    Quorum and Adjournments. Except as otherwise provided by law or by this Operating Agreement, the holder of a majority of the voting power of the Company shall constitute the quorum necessary for the meeting to occur and to conduct business. If, during the course of a meeting, the meeting is adjourned to a new date, notice of the new meeting date and place shall be given in the manner as provided in section 2.3 above.

    2.6    Unanimous Consent. Any matter that may be decided in an annual meeting of Members or at a special meeting of Members may be decided by a unanimous written consent of the Members without having a meeting. Any such unanimous consent shall be in writing, and signed and dated by all of the Members. It shall be kept in the regular minutes of the meetings of Members of the Company.

    2.7    Telephone Meetings. Any meeting may be conducted over the telephone provided that all of the Members present can hear all of the other Members and can be heard by them.

## 3.0  MANAGER

    3.1    Initial Manager. The initial Manager shall be Ilene Morris-Sambur.

    3.2    Election of Manager. The Manager shall be elected at each annual meeting of the Members or at a special meeting called for the purpose of electing a successor Manager in the event the Manager resigns.

    3.3    Term of Office. The Manager shall hold office until his successor is elected at the next annual meeting of Members or at such time as he may resign, be removed from office, or die. Upon the resignation, removal or death of the Manager, the Members shall convene a special meeting for the purpose of electing a successor manager.

    3.4    Authority of Manager.

        a.    The Manager shall be responsible for management of the Company's day to day business operations with all rights and powers generally conferred by law or necessary, advisable or consistent therewith, but subject to the limitations set forth in this Operating Agreement.

        b.    Any person entering into any agreement or contract with the Company or otherwise dealing with the Company shall not be required to inquire as to the authority of the Manager to act for and on behalf of the Company, and such persons may conclusively rely upon the act or acts of the Manager as being the act or acts of the Company and binding upon and enforceable against the Company.

        c.    The power and authority of the Manager shall be subject in all cases to (i) the provisions of this Operating Agreement, (ii) the decisions of the Members at the annual or a special meeting of Members, and (iii) the requirements of applicable law.

2

FAWZY000003

d.  The Manager shall not undertake any of the following actions without the approval of the Members taken at a special meeting or annual meeting of the Members:  (i) amend this Operating Agreement, (ii) deviate from the purposes of the Company as set forth in Section 1.2 above, (iii) cause the Company to borrow money in excess of $30,000.00 from any person or entity, (iv) engage in business in any jurisdiction which does not provide for the registration of limited liability companies, (v) pay fees to a Member or to himself, (vi) dissolve or wind up the Company, (vii) admit any other members to the Company, (viii) transfer a percentage interest in the Company, except as provided in this Agreement, (ix) grant a security interest in any property of the Company or (x) take any act contrary to decisions made by Members at a special or annual meeting of Members.

3.5    Compensation.  The Manager shall receive no compensation for his services unless the Members unanimously agree otherwise.

## 4.0    INDEMNIFICATION

4.1    Third Party Actions.  The Company shall indemnify and defend any Member or Manager who is or was a party or who is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative, including all appeals, by reason of the fact that he is or was a Member, Manager or employee of the Company, against any and all expenses (including reasonable attorneys fees), judgments, decrees, fines, penalties, and amounts paid in settlement which were actually and reasonably incurred by him in connection with such action, suit, or proceeding, if he acted in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company, and, with respect to any criminal action or proceeding, he had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction or plea or its equivalent shall not, by itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company.

4.2    Derivative Actions.  The Company shall indemnify any Member or Manager who is or was a party or who is threatened to be made a party, to any threatened, pending or completed action or suit, including all appeals, by or on behalf of the Company in order to procure a judgment in its favor by reason of the fact that he is or was a Member or Manager of the Company, against any and all expenses (including reasonable attorneys fees) which were actually and reasonably incurred by him in connection with the defense or settlement of such action or suit so long as he acted in good faith and in a manner which he reasonably believed to be in, or at least not opposed to, the best interests of the Company; except that no indemnification shall be made with respect to any claim, issue or matter as to which such person shall have been finally adjudged to be liable for negligence or misconduct in the performance of his duty to the Company unless, and only to the extent that, the court in which such action or suit was brought shall determine upon application that despite the adjudication of liability and in view of all of the circumstances of the case, such person is fairly and reasonably entitled to indemnification for such expenses as the court may deem proper.

4.3    Rights after Successful Defense. ·To the extent that a Member or Manager has been successful on the merits or otherwise in defense of any action, suit or proceeding, he shall be indemnified against expenses (including reasonable attorneys fees), actually and reasonably incurred by him in connection therewith.  Any indemnification under Section 4.2 shall be made by the Company only as authorized in a specific case upon determination that indemnification of the Member or Manager is proper under the circumstances because he or she has met the applicable standard of conduct, and such determination shall be made by majority vote of the Members.

4.4    Expenses. Expenses of each person indemnified hereunder, which were incurred in defending against a civil, criminal, administrative or investigative action, suit or proceeding (including all appeals), or threat thereof, may be paid by the Company in advance of the final disposition of such action, suit or proceeding if authorized by the Members following receipt of a written undertaking by or on behalf of the Manager or Member being indemnified to repay such amount, unless it shall be ultimately determined that he is entitled to be

3

FAWZY000004

indemnified by the Company.

    4.5    <u>Nonexclusive</u>. The indemnification provisions of this Section 4.0 shall not be deemed to be exclusive of any other rights to which those seeking indemnification may be entitled as a matter of law.

    4.6    <u>Insurance</u>. The Company may purchase and maintain insurance on behalf of any person who is a Manager or Member of the Company against any liability asserted against him or incurred by him in any such capacity or arising out of his status as such, whether or not the Company would have the power to indemnify him against such liability under the provisions of this Section 4.0 or under the provisions of the laws of the State of New Jersey.

    4.7    <u>Notice</u>. Any person who intends to seek indemnification by the Company pursuant to this Section 4.0 must give prompt notice to the Company of any claim, suit or action, and must fully cooperate with the Company in the defense of the claim, suit or action. Failure to comply with this Section 4.7 will relieve the Company of its indemnification obligations to the extent it is prejudiced by such failure.

## 5.0    CAPITAL AND L.L.C. PERCENTAGE INTEREST

    5.1    <u>Definitions</u>. As used in this Operating Agreement "LLC Interest" shall refer to a Member's entire right, title and interest in the Company. "LLC Percentage Interest" shall mean, as to each Member, the percentage interest in the Company allocated to such Member on the books and records of the Company. The initial LLC Percentage interest of each Member is set forth in Section 5.2.

    5.2    <u>Initial Capital Contribution and L.L.C. Percentage Interest</u>. In exchange for their respective LLC Interest, each Member has contributed the monies and assets as follows and each has acquired the following LLC Percentage Interest:

| <u>Member</u> | <u>Initial Capital Contribution</u> | <u>Initial LLC Percentage Interest</u> |
|---|---|---|
| Ilene | $ _____ | 67% |
| Sameh | $ 100,000.00 | 33% |

    5.3    <u>Additional Funding</u>. To the extent feasible, if additional funds are needed by the Company, the Manager will endeavor to borrow those funds from a financial institution on such terms and conditions and at such interest rates as are approved by the Members at a special meeting called for that purpose.

    5.4    <u>Capital Call</u>. If additional funding is not available from third parties as provided in Section 5.3 hereof or if the Manager deems it advisable to have a capital call, then the Manager may call upon the Members to contribute additional capital. Each Member shall contribute additional capital to the Company on a pro rata basis in proportion to his respective LLC Percentage Interest, whenever, in the opinion of the Manager, such additional funds are necessary to further the interests or to accomplish the business or purposes of the Company. Unless the Members unanimously agree otherwise, all additional capital contributions shall be in the form of money either by personal or bank check and shall be made within thirty (30) days after the giving of written notice by the Manager to the Members, in which notice the amount due and owing by each Member and the purpose for which the same is being requested shall be specified. If a Member fails to pay his additional contribution to the Company in accordance with the foregoing provision of this Section 5.4, the Member who has made the additional capital contribution shall elect to treat his additional contribution as either (i) a demand loan to the Company with simple interest at the prime rate of interest as published in the Wall Street Journal, which interest shall be paid by the Company to him on the last business day of each month, or (ii) a contribution to capital which shall result in the proportional increase of the LLC Percentage Interest of the contributing Member and a decrease of the LLC Percentage Interest of the non-contributing Member. Until the contributing Member makes the election as provided in the preceding sentence, the Company shall treat his contribution as a demand loan.

    5.5    <u>No Priority</u>. No Member shall be entitled to withdraw or demand the return of any part of his capital contribution except with the written consent of the other Member. No Member shall have the right to demand or receive property other than cash in return for his capital contribution as a distribution of income.

FAWZY000005

No Member shall have priority over any other Member either as to the return of his capital contribution to the Company or as to any distributions. No interest shall be paid on any capital contribution.

5.6    Guaranty.  In the event that a lending institution or creditor of the Company requires personal guaranties of the Members and only one Member provides that guaranty, then the LLC Percentage Interest of the guarantying Member shall be increased and the LLC Percentage Interest of the non-guarantying Member shall be decreased on the basis of one dollar for each four dollars guaranteed.

## 6.0    ALLOCATION OF PROFIT & LOSS AND DISTRIBUTIONS

6.1    Distributions of Cash Flow.  The Manager shall make distributions of cash flow to Members and shall retain such funds in the Company as the Members deem necessary to cover the Company's reasonable business needs, which shall include reserves against possible losses and the payment or making provision for payment when due of obligations of the Company. Any cash flow distribution shall be made to the Members in accordance with their respective LLC Percentage Interests.

6.2    Allocations.  Income from operations and losses from operations shall be allocated to the Members in accordance with their respective LLC Percentage Interests.

6.3    Capital Accounts.  There shall be established and maintained on the books of the Company a capital account for each Member.  The accountant for the Company will make adjustments to the capital account from time to time as he deems appropriate in accordance with generally accepted accounting principles, consistently applied.  The accountant for the Company shall also maintain an account of the LLC Percentage Interest of each Member.

6.4    Fiscal Year.  The fiscal year for the Company for both accounting and tax purposes shall be the calendar year ending on December 31 of each year.

6.5    Tax Election.  The Company will be recognized as a partnership for federal and state tax purposes.  No Member shall take any action or refuse to take any action which would cause the Company to forfeit the benefits of such tax election.  If necessary, Ilene will be the "tax matters partner" for purposes of the Internal Revenue Code.

## 7.0    RESTRICTIONS ON TRANSFER AND ENCUMBRANCES

7.1    No Transfers or Encumbrances.  Except as hereinafter provided in this Section 7, no Member may transfer or permit his LLC Interest or any part of it to be transferred to any third party. Any person into whose hands an LLC Interest shall fall shall automatically become bound by all of the terms and conditions of this Operating Agreement.  No member may grant a security interest in his LLC Interest.  No Member may pledge or otherwise encumber his LLC Interest or offer his LLC Interest as security for any debt or obligation.

7.2    Death.  Upon the death of a Member, any appraisal right that may exist under law shall be deemed waived and the LLC Interest of the Member shall become a part of his estate and distributed in accordance with his will or, if there is no will, in accordance with the New Jersey laws of intestacy.  The death of a Member shall be a ground for dissolution under Section 9.1 below, unless the surviving Member elects (within forty-five (45) days of the date of death) to continue the Company.

7.3    Permanent Disability.  In the event of the permanent disability of a Member, his L.L.C. interest shall remain a part of his estate.

7.4    Withdrawal.  In the event a Member wishes to withdraw from the Company, he will follow the procedure set forth in this Section 7.4.

a.    In no event may a Member seek to withdraw from the Company during the first two years of the Company's existence.

b.    If a Member wishes to withdraw, he shall notify the other Member of his desire to withdraw and shall offer the other Member the opportunity to purchase the withdrawing Member's LLC Interest

5

FAWZY000006

at a price determined by the following formula: average earnings before interest, taxes, debt, and depreciation over the prior three years capitalized at a 9% rate of return times the withdrawing Member's LLC Percentage Interest. That offer shall remain open for one hundred eighty (180) days.

   c. If the non-withdrawing Member declines to accept the offer at the price set forth in Section 7.4b within the 180 day period, then the withdrawing Member may offer his LLC Interest to a third party, subject to the right of first refusal set forth in Section 7.4d.

   d. If the withdrawing Member receives an acceptable bona fide offer from a third party to purchase his LLC Interest, he shall offer to sell his LLC Interest to the non-withdrawing Member at the same price and terms and conditions as offered by the third party and shall provide the non-withdrawing Member with a copy of that offer. The non-withdrawing Member shall have the right to purchase the withdrawing Member's LLC Interest on the same terms and conditions as set forth in the third party offer, provided that he gives notice to the withdrawing Member of his intention to do so within thirty (30) days of receipt by the non-withdrawing Member of the written details of the third party offer.

   e. If the non-withdrawing Member buys the LLC Interest of the withdrawing Member, then the non-withdrawing Member will indemnify the withdrawing Member with respect to any personal guaranties the withdrawing Member may have given for obligations of the Company.

   f. If the non-withdrawing Member buys the LLC Interest of the withdrawing Member, then the closing on the purchase will take place at the principal office of the Company within ninety (90) days of the date the non-withdrawing Member accepts the offer.

   7.5 Conditions Applicable to Transfers. Notwithstanding anything to the contrary containing in this Operating Agreement:

   a. Any sale, assignment or transfer, whether direct or indirect, of any LLC Interest shall be made in full compliance with all applicable statutes, rules and regulations and in full compliance with any mortgage or loan agreement affecting the Business;

   b. No change in ownership of an LLC Interest of any Member shall be binding upon the Company or any other Member unless and until (i) true copies of the instrument or instruments of transfer executed and delivered pursuant to or in connection with such transfer shall have been delivered to the Manager, (ii) the transferee shall have delivered to the Manager an executed and acknowledged assumption agreement pursuant to which the transferee assumes all of the obligations of the transferor hereunder and agrees to be bound by all of the provisions of this Operating Agreement, (iii) the Manager shall have consented thereto, and (iv) the transferee shall have executed, acknowledged and delivered any instrument required by law to effect such transfer.

   7.6 Transferees by Operation of Law. If, notwithstanding the provisions of Section 7.0, any person acquires all or any part of the LLC Interest of any Member in violation of this Section 7.0, by operation of law or judicial proceeding, the holder of said LLC Interest shall be entitled only to receive the share of income, losses and cash flow to which said Member would otherwise have been entitled, and said person shall have no right whatsoever to participate in the management, business or affairs of the Company and no right to vote on any matters coming before the Company.

   7.7 Waiver. In the event of the resignation or withdrawal of a Member, the rights of the resigning or withdrawing Member shall be governed by this Article 7.0, and the Member shall not have any right to compel the Company to pay him the fair value of his interest in the Company, and the Member shall not have any right to compel the Company to return his capital contribution to him, and any statute or law entitling him to such payment is waived.

**8.0 DEFAULT**

   8.1 Notice and Cure. In the event of any breach of the obligations, terms or conditions of this Operating Agreement by a Member, the other Member shall give the defaulting Member notice of the default

FAWZY000007

in writing with sufficient detail as to the nature of the default, and the defaulting Member shall have thirty (30) business days within which to cure the default.

     8.2    Remedies. In the event that the defaulting Member fails to cure the default within the period permitted by Section 8.1, then the non-defaulting Member shall have the following remedies:

        a.    Any rights and remedies as provided in this Operating Agreement;

        b.    Any rights and remedies as provided by law;

        c.    The right to expel the defaulting Member from the Company and buy out his LLC Interest on the following basis:

           (1)    The non-defaulting Member shall give written notice of his exercise of his rights under this section to the defaulting Member;

           (2)    The price for the purchase of the defaulting Member's LLC interest shall be the price as established pursuant to Section 7.4b above, except that the cap rate shall be 11% instead of 9% and the price shall be further reduced by the cost to redress the damage to the Company caused by the default of the defaulting member and the costs and expenses of the expulsion process;

           (3)    The closing on the purchase shall take place at a time and place as determined by the non-defaulting Member, which time shall be no sooner than 10 business days after the end of the cure period and no later than 60 days after the end of the cure period. The purchase price will be paid by way of a promissory note over a five year term beginning 180 days after the date of closing with payments on a monthly basis consisting of one-sixtieth of the principal each month and interest on the unpaid balance each month at the rate of the prime rate of interest, per annum. No payments will be made during the first 180 days after the closing and no interest will accrue during that period.

## 9.0    TERMINATION

     9.1    Termination. The Company shall be terminated and dissolved upon:

        a.    The unanimous vote of all Members holding an interest in the Company;

        b.    The filing by the Company for protection under any bankruptcy or insolvency law;

        c.    The death of both Members within sixty days of each other;

        d.    As otherwise provided in this Operating Agreement.

     9.2    Continuing Governance. In the event of the dissolution of the Company, the business affairs of the Company shall continued to be governed by the terms of this Operating Agreement during the winding up of the Company's business and affairs. If a trustee in dissolution or receiver is appointed to wind up the affairs of the Company, the Manager shall be the person so appointed, unless he is in default or is the cause of the dissolution.

## 10.0    GENERAL PROVISIONS

     10.1    Notices. Any notices required pursuant to this Agreement shall be in writing and shall be sent by any two of the following methods: (i) certified mail, return receipt requested, (ii) regular mail, (iii) Federal Express or other nationally recognized courier service, and (iv) hand delivery. All notices to the Company shall also be sent to the other Member.

        All notices to Ilene shall be sent to:
        541 Berkshire Valley Road
        Wharton, New Jersey 07885
or such other address as Ilene may notify the Company and the other Member.

        All notices to Sameh shall be sent to:
        6900 Georgia Avenue

7

FAWZY000008

NW Malone House
Washington, D.C. 20307
or such other address as Sameh may notify the Company and the other Member.

    10.2   Further Assurances. Each party hereto shall execute, acknowledge and deliver such further certificates, instruments, agreements or other documents and take such further action as may be required in order to carry out the purposes of the Company and the intentions of this Operating Agreement.

    10.3   No Partition. Each Member hereby permanently waives and relinquishes any and all rights he may have to cause all or any part of the property of the Company to be partitioned. It is the intention of the Members to prohibit any Member from bringing a suit for partition against any other Member.

    10.4   Waiver. No consent or waiver, express or implied, by any Member or by the Manager to or of any breach or default by any other Member or of the Manager in the performance by any other Member or Manager of his obligations hereunder shall be deemed or construed to be a consent to or a waiver of any other breach or default in the performance by such other Member or Manager of the same or any other obligation of such Member or Manager hereunder. Failure on the part of a Member or Manager to complain of any act or failure to act of any other Member or to declare such other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member or Manager of his rights hereunder.

    10.5   Severability. If any provision of this Agreement or the application thereof to any person or circumstance shall be invalid or unenforceable to any extent, the remainder of this Agreement and the application of such provisions to other persons or circumstances shall not be affected thereby and shall be enforced to the greatest extent permitted by law, and such remaining provisions may be equitably reformed by the court.

    10.6   Choice of Law. This Agreement and all matters relating to the Company shall be governed and construed in accordance with the laws of the State of New Jersey.

    10.7   Entire Agreement. This Agreement constitutes the entire Agreement amongst the parties hereto and may not be modified or amended except in writing and signed by all of the Members.

IN WITNESS WHEREOF, the Members have executed this Agreement to be effective as of the day and year first above written, intending to be legally bound.

Signed, sealed and delivered in the
presence of:

_____       _____
       , Witness                        Ilene Morris-Sambur

Signed, sealed and delivered in the
presence of:

_____       _____
       , Witness                        Sameh Fawzy

8

FAWZY000009